**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| Atlantic Health Systems, Inc., | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 08-3194 (WHW) |
| | : | |
| Cummins Inc., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

<u>**Walls, Senior District Judge**</u>

Plaintiff Atlantic Health Systems, Inc. ("Atlantic") has filed breach of express and implied warranty, breach of contract, strict products liability, negligence and res ipsa loquitur claims against defendant Cummins Inc. ("Cummins"). Cummins moves for summary judgment on all claims. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, the motions are decided without oral argument. Defendant's motion for summary judgment is granted in part and denied in part.

### FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a power failure that occurred at the Overlook Hospital in Summit, New Jersey on May 7, 2006. The Overlook Hospital is owned and operated by plaintiff Atlantic. (Compl. ¶ 1.) The hospital's emergency back-up power system was comprised of four diesel generators. The system's purpose was to provide the hospital with electrical power in the event

1

**NOT FOR PUBLICATION**

that electrical service from the local public utility was interrupted or lost.  One of these

generators was manufactured by Caterpillar and is not involved in this litigation.  (Pl. Ex. 5,

Glover Dep.)  The other three were designed and manufactured by defendant Cummins.

(Liebesfeld Aff. at ¶ 5.)  The parties refer to these generators as generator number one, generator

number two and generator number three.  The generators also contained component parts

manufactured by other companies, including speed governors manufactured by Bosch and

electrical components manufactured by Russell Electric.  (Liebesfeld Aff. at ¶ 10; Glover Aff. at

¶ 7.)

The generators were sold to Atlantic by Cummins Metropower, Inc. ("Cummins

Metropower"), a Cummins distributor.  (Pl. Ex. 4, Sadtler Report).  They were installed at the

hospital by Cummins Metropower in 1983.  (Id.)  Cummins issued a warranty for each generator

installed.  The express warranty included a Base Warranty and an Extended Major Components

Warranty (the terms of the warranty are discussed infra).  Cummins disclaimed all other express

and implied warranties.  (Pl. Ex. 11, Cummins Warranty.)

On May 7, 2006, there was a loss of normal utility power at the Overlook Hospital,

followed by the failure of the emergency backup power system.  (Compl. ¶ 7.)  Generator

number two was out of service for repairs on the date of the power failure.  (Pl. Ex. 4, Sadtler

Report at 3.)  The system was designed to provide sufficient power to the hospital so long as two

of the three Cummins generators were functional.  Generators one and three should have been

able to provide the hospital with sufficient power, but shortly after those generators started

running they malfunctioned and failed.  (Id.)  The parties' experts have different theories as to

why this occurred.  Atlantic states that the hospital was left without power for a significant

**NOT FOR PUBLICATION**

period of time on May 7, 2006, and sustained substantial property and business interruption

damages.  (Compl. ¶ 10.)

      Atlantic had a series of Planned Maintenance Agreements with Cummins Metropower,

under which Cummins Metropower was responsible for servicing and maintaining all of the

hospital's power generators.  (Pl. Ex. 4, Sadtler Report.)  The repair service histories in the

record date back to 1998.  (Id.)  A renewal of the agreement was entered into on December 19,

2005, to cover the 2006 calendar year, and was in effect on the day of the power failure.  (Id.)

Under this agreement, Atlantic paid an annual rate of $11,900 for maintenance services, which

included $6,500 for one annual preventive maintenance service and $5,400 for four quarterly

service inspections.  (Df. Ex. 2, Planned Maintenance Agreement.)

      On May 6, 2008, plaintiff filed the present complaint.  Cummins, Inc. is the only

defendant.  Atlantic did not sue Bosch, Russell Electric, or Cummins Metropower.  Cummins

moved for summary judgment on September 10, 2010.  (ECF No. 33.)  The plaintiff filed

opposition to the defendant's motion on October 18, 2010.  (ECF No. 41.)

## STANDARD OF REVIEW

      Summary judgment is appropriate where the moving party establishes that "there is no

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A factual dispute between the parties will not defeat a motion for

summary judgment unless it is both genuine and material.  See Scott v. Harris, 550 U.S. 372, 380

(2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is

genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under

the substantive law, it would affect the outcome of the suit.  See Anderson, 477 U.S. at 248.  The

moving party must show that the non-moving party has failed to "set forth," by affidavits or

**NOT FOR PUBLICATION**

otherwise, "specific facts showing that there is a genuine issue for trial." See Beard v. Banks, 548 U.S. 521, 529 (2006) (citing Fed. R. Civ. P. 56(e)).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" in question. Scott, 550 U.S. at 380 (citing Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue of fact for trial. See Anderson, 477 U.S. at 249. In so doing, the court must construe the facts and inferences in the light most favorable to the non-moving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002). To survive a motion for summary judgment, a non-movant must present more than a mere "scintilla of evidence" in his favor. Woloszyn v. Cnty. of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The opposing party must set forth specific facts showing a genuine issue for trial. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).

## DISCUSSION

### I.    Cummins Inc. and Cummins Metropower, Inc.

The plaintiff and defendant largely talk past one another in their motion papers, because they take very different positions on the relationship between Cummins, Inc. and Cummins Metropower, Inc. Cummins Metropower, as noted, was not sued by the plaintiff. Cummins insists that Cummins Metropower is an independent distributor and a completely separate entity. Cummins argues, in effect, that it is simply the wrong party being sued on many of Atlantic's claims. Atlantic acknowledges that Cummins Metropower is a Cummins distributor, but takes issue with the word "independent."

4

**NOT FOR PUBLICATION**

Neither party marshals much evidence to support its position. Cummins submits a Certificate of Incorporation from the State of New York for Cummins Metropower. (Df. Ex. 3, Cert. of Incorporation.) Atlantic submits an additional page from the Cummins Warranty booklet, which states the following under the heading "Single Source Responsibility:"

> Cummins Engine Company[1] and its distributors are responsible for the Cummins generator set system from assisting in the selection of the proper unit and its associated controls to the design, manufacture, testing, installation, and service of the complete system.

(Pl. Ex. 11, Cummins Warranty.) Atlantic relies on the conjunctive phrase "Cummins Engine Company *and* its distributors" to argue that Cummins and Cummins Metropower shared joint responsibility for the generators, from installation through maintenance. Additionally, the Cummins logo, which appears on the warranty information, also appears on the Planned Maintenance Agreements between Cummins Metropower and Atlantic. The Court finds that a material dispute of fact exists as to the relationship between Cummins and Cummins Metropower, and their respective responsibilities and liability. The evidence provided is insufficient for the Court to conclude as a matter of law that Cummins and Cummins Metropower are, or are not, legally independent entities. The Court will view the facts in the light most favorable to the plaintiff, and leaves Atlantic to its proofs at trial.

**II.    Breach of Express and Implied Warranty Claims**

The power outage occurred on May 7, 2006. The backup power generation system was purchased and installed in 1983. Cummins issued express warranties for each generator installed at the Overlook Hospital, including a Base Warranty and an Extended Major Components Warranty. (Pl. Ex. 11, Cummins Warranty.) The Base Warranty covered:

---

[1] The parties do not dispute that Cummins Engine Company is Cummins, Inc.

**NOT FOR PUBLICATION**

> [A]ny failures of the Product which result, under normal use and service, from defects in workmanship or material.  This coverage extends for one year from the date of delivery of the Product to the first year.

The Extended Major Components Warranty covered:

> [F]ailures of the engine cylinder block, camshafts, crankshafts and connecting rods which result under normal use and service, from defects in workmanship or material in these parts.  Bushing and bearing failures are not covered.  This coverage begins with the expiration of the Base Warranty and ends three years or 10,800 hours of operation, whichever occurs first, from the date of delivery to the first user.

Under the Base Warranty, Cummins agreed to "pay for all parts and labor needed to repair the damage to the Product resulting from the warrantable failure."  Cummins disclaimed all other express and implied warranties, stating:

> THE WARRANTIES SET FORTH HEREIN ARE THE SOLE WARRANTIES MADE BY CUMMINS IN REGARD TO THESE PRODUCTS.  CUMMINS MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED OR FOR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

The parties do not dispute that the breach of warranty claims are governed by New Jersey's Uniform Commercial Code, N.J.S.A. § 12A:1-101 et. seq., nor do they dispute that the applicable statute of limitations for these claims is four years.  N.J.S.A. § 12A:2-725.  However, the parties dispute when the cause of action accrued.  N.J.S.A. § 12A:2-725 reads:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Cummins argues that the breach of warranty claims are time barred.  Atlantic counters that the "discovery rule" serves to toll the statute of limitations in this case.  Atlantic asserts that because Cummins' warranties extended to future performance of the goods, the cause of action did not

**NOT FOR PUBLICATION**

accrue until Atlantic knew, or should have known, about the breach (i.e., the day of the power failure).

The Cummins warranties clearly extend to the future performance of the generators.  A warranty of future performance is more than a mere representation of the product's condition at the time of delivery.  <u>Travelers Indem. Co. v. Dammann & Co., Inc.</u>, 592 F.Supp.2d 752, 764 (D.N.J. 2008); aff'd <u>Travelers Indem. Co. v. Dammann & Co.</u>, 594 F.3d 238 (3d Cir. 2010).  "Under New Jersey law, '[t]he key requirement in finding a warranty of future performance is that it makes specific reference to a future time period.'"  <u>Id.</u>  (citing <u>Comm'rs of Fire Dist. No. 9 v. American La France</u>, 176 N.J.Super. 566, 573 (App.Div.1980)).  Cummins' Base Warranty makes specific reference to a future time period of one year, and Cummins undertakes an obligation to repair or replace in the event of a warrantable failure.  The Extended Major Components Warranty coverage begins with the expiration of the Base Warranty and ends after three years or 10,800 hours of operation, whichever occurs first.

However, the Court concludes that the claims are nonetheless time barred and will be dismissed. In a factually analogous case, <u>South Jersey Gas Co. v. Mueller Co., Ltd.</u>, the defendants stressed that the plaintiff "did not discover the defect during the one-year period provided for the [defendant's] warranty."  Civ. No. 09-4194, 2010 WL 1742542, at *7 (D.N.J. Apr. 27, 2010).  The defendants argued that the warranty afforded the plaintiff "with one year from delivery to discover the defect and four years thereafter to bring suit."  <u>Id.</u>  Because the defendants sold their product to the plaintiff in the early 1990s, and "the plaintiff did not discover the alleged defect until 2005," the plaintiffs claims were time barred.  <u>Id.</u>  The plaintiff argued that because N.J.S.A. § 12A:2-725(2) does not "explicitly limit the discovery period to the future warranty period," this "means that the statute begins to run at the time of the actual or

NOT FOR PUBLICATION

constructive discovery and stops four years later, regardless of the length of the underlying

warranty."  Id.

There, the court found that the plaintiff's reading did not comport "with the plain and

ordinary meaning of the statute."  Id.  The court concluded that "the statute plainly instructs that

the running of the statute awaits discovery of the defect, *provided* the defect is discovered during

the warranty period."  Id.  (emphasis in original).  The court reasoned:

> Reading the statute as Plaintiff suggests would effectively transform limited
> warranties for specific periods of time into unlimited warranties pursuant to which
> a seller's vulnerability to suit could potentially extend ad infinitum.  This is
> almost certainly not the result intended by the New Jersey Legislature.

Id.  The court also noted that its reading of the statute was consistent with the Third Circuit's

express warranty jurisprudence.  Id. at *9 (discussing Duquesne v. Westinghouse Elec. Corp., 66

F.3d 604 (3d Cir. 1995)).

Here, the plaintiff and defendant make substantially the same arguments as the Mueller

parties.  Atlantic relies upon Foodtown v. Sigma Mktg. Sys., Inc., 518 F.Supp. 485 (D.N.J.

1980), to argue that the discovery rule should apply, but its reliance upon Foodtown is

misplaced.  Foodtown held that a cause of action typically accrues when delivery is made, except

in situations when a warranty explicitly extends to future performance.  Id. at 488.  Foodtown did

not hold that a warranty for future performance extends indefinitely beyond the warranted period

to whenever a plaintiff discovers an alleged breach.

Here, Atlantic's breach of warranty claims expired no later than 1991 under the

applicable four-year statute of limitations.  Atlantic received delivery of the Cummins generators

in 1983.  The express warranty issued by Cummins promised to repair any warrantable failures

that occurred under the Base Warranty within one year of delivery, or within four years under the

Extended Major Components Warranty.  As such, Atlantic's breach of warranty claims were

NOT FOR PUBLICATION

time-barred, at most, eight years after the delivery of the generators to Overlook Hospital.

N.J.S.A. §12A:2-725 is "meant to provide buyers with four years to bring suit on a warranty and

to afford sellers with repose thereafter." Mueller, 2010 WL 1742542, at *7.  To find that the

Cummins generators were still covered by these express warranties 25 years after delivery would

not provide Cummins with the repose that the statute intended, and would provide Atlantic with

the benefit of a bargain it did not strike.

 Atlantic also seeks to assert a claim against Cummins for Breach of Implied Warranty.

Implied warranties, by their very nature, cannot extend to future performance because such an

extension must be explicit and an implied warranty cannot explicitly state anything. Dammann,

592 F.Supp.2d at 765 ( "Because an implied warranty is one that arises by operation of law

rather than by an express agreement of the parties, courts have consistently held it is not a

warranty that 'explicitly extends to future performance of the goods ....' " (citing U.C.C. § 2-

725(2) and collecting cases). Hence, for the same reasons that Atlantic's claim for breach of

express warranty is time barred, the claim for breach of implied warranty is also time barred.

  A. *The Plaintiff's Breach of Warranty Claims are also Barred by the Terms of the*
   *Express Warranties and Disclaimer*

 In addition to finding that the breach of warranty claims were barred by the statute of

limitations, the Mueller court found that the plaintiff's "express warranty claims must also fail as

a direct consequence of the language of the Mueller Warranty, quite apart from the statute of

limitations."  2010 WL 1742542, at *9.  The plaintiff was essentially "alleging a latent defect –

that the valves were defectively designed during the warranty period, but that the defect was not

discovered until many years afterwards." Id.  The court noted that the Mueller Warranty

protected against defects for one year, and required prompt notice to trigger the repair/replace

obligation. Id.  "[D]efects discovered after the warranty period are not actionable as notice

**NOT FOR PUBLICATION**

cannot be given as to undiscovered facts." Id.  The plaintiff's breach of warranty claims must fail "whether by operation of the statute of the limitations or by virtue of the fact that the Mueller Warranty simply does not warrant that the valves will be defect-free in 2005." Id.  Similarly, Atlantic is alleging a latent defect – that the power generators were defectively designed or manufactured during the warranty period, but that the defect was not discovered until many years afterwards.  Atlantic did not give Cummins notice to trigger the repair/replace obligation during the warranted time period, and their breach of warranty claims must fail on this basis as well.

Any implied warranties are also barred by the express terms of Cummins' disclaimer. Cummins disclaimed implied warranties, which it was permitted to do under the New Jersey Uniform Commercial Code.  N.J.S.A. §12A:2-316.  In order to exclude the implied warranty of merchantability, a disclaimer must mention merchantability and, when written, must be conspicuous.  N.J.S.A. §12A:2-316(2).  In order to exclude the implied warranty of fitness for a particular purpose, a disclaimer must be in writing and conspicuous.  Id.  "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it.  A printed heading in capitals . . . is conspicuous.  Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color."  N.J.S.A. 12A:1-201(10).  "Whether a term or clause is 'conspicuous' or not is for decision by the court."  Id.

The Court finds that Cummins' disclaimer of implied warranties was conspicuous.  The disclaimer can be found with all of the other warranty information, it is on 8.5 x 11 paper, and the font size and type are normal.  It mentions merchantability and fitness for a particular purpose; it is in writing; it is in all capital letters. The plaintiff concedes as much, but asserts that the warranty "was not on a page signed by the representatives of Atlantic Health."  (Pl. Opp. Br. at 18.)  The plaintiff cites no legal authority for any such requirement.  The plaintiff also argues

NOT FOR PUBLICATION

that the disclaimer was not conspicuous because it was on the last page of the warranty booklet,

citing Herbstman v. Eastman Kodak Co., 131 N.J.Super. 439 (App. Div. 1974).  That case is

distinguishable in many respects, particularly in light of its reversal by the Supreme Court of

New Jersey (the plaintiff claims on "other grounds," but that is not entirely clear).  See

Herbstman v. Eastman Kodak Co., 67 N.J. 94 (1975).  In any event, the Court finds that the

waiver was sufficient notwithstanding its location on the last page of the warranty information.

The Court concludes that the waiver was conspicuous and valid as a matter of law.

    B.  Estoppel

    Atlantic relies upon Biocraft Laboratories, Inc. v. USM Corp., 163 N.J.Super. 570 (App.

Div. 1978) to argue that even if the claims are time barred, assurances made by Cummins weigh

in favor of finding that Cummins should be estopped from relying on the statute of limitations

defense.  Biocraft is distinguishable.  There, the plaintiff purchased a capsule filling machine

from defendant in April of 1972, and filed suit for breach of warranty in September of 1976.  Id.

at 571.  The defendant had made repeated attempts to cure and repair defects in the machine

during the warranty period and the four-year statute of limitations.  Id. at 572.  The court noted

that the "making of repairs would not by itself toll the statute," but the plaintiff alleged that it had

withheld instituting legal action within the statute of limitations in reliance on certain promises

made by the defendant which were not fulfilled.  Id. at 572-73.  In these specific circumstances,

the court found that summary judgment should not have been entered against plaintiff.  Id. at

573.  Here, the plaintiff did not file suit months after the statute of limitations expired, but twenty

years after the statute of limitations expired.  There is no evidence of a specific, ongoing repair

that the defendant undertook during the warranty period and continued making promises about

during those twenty years (a maintenance contract is a separate matter, and will be discussed in

**NOT FOR PUBLICATION**

turn).  Nor did the plaintiff withhold filing suit because of promises made by the defendant.  The

defendant is not estopped from reliance upon the statute of limitations defense.

    **III.**      **<u>Strict Products Liability Claims</u>**

        The plaintiff's strict products liability claims are governed by New Jersey's Products

Liability Act, N.J.S.A. 2A:58C-1 to -11 (although not cited in plaintiff's brief).  The Act

provides that a plaintiff can prove a product defect in the following ways:

> A manufacturer or seller of a product shall be liable in a product liability action
> only if the claimant proves by a preponderance of the evidence that the product
> causing the harm was not reasonably fit, suitable or safe for its intended purpose
> because it: a. deviated from the design specifications, formulae, or performance
> standards of the manufacturer or from otherwise identical units manufactured to
> the same manufacturing specifications or formulae, or b. failed to contain
> adequate warnings or instructions, or c. was designed in a defective manner.

N.J.S.A. 2A:58C-2.  As a result, three distinct types of strict liability actions have developed in

the case law: those alleging manufacturing defect, design defect and warning defect.  The

plaintiff appears to allege all three in its "Third Cause of Action in Strict Products Liability."

(Compl. ¶ 36.)

        To the extent that the plaintiff is alleging a warning defect, that claim is dismissed.  The

Product Liability Act says that a manufacturer "shall not be liable for harm caused by a failure to

warn if the product contains an adequate warning or instruction or, in the case of dangers a

manufacturer or seller discovers or reasonably should discover after the product leaves its

control, if the manufacturer or seller provides an adequate warning or instruction."  N.J.S.A.

2A:58C-4.  A plaintiff must prove that the defendant had a duty to warn, and that an inadequate

warning was provided.  <u>James v. Bessemer Processing Co.</u>, 155 N.J. 279, 297-98 (1998).

Atlantic has not discussed Cummins' duty to warn, nor has it provided any evidence of warnings

it received, written or oral.  It is impossible for the Court to assess the reasonableness or

**NOT FOR PUBLICATION**

adequacy of warnings that are not before it.   The defendant is entitled to summary judgment on the warning defect claim.

Plaintiff's remaining theories are for design and manufacturing defects.  In any products liability action, the "plaintiff must . . . prove that the product was defective under [New Jersey's] common law jurisprudence that was incorporated into the Act."  Myrlak v. Port Auth. of New York and New Jersey, 157 N.J. 84, 97 (1999).  Based upon the "well-established case law in this area," this requires "a plaintiff [to] prove that the product was defective, that the defect existed when the product left the manufacturer's control, and that the defect proximately caused injuries to the plaintiff, a reasonably foreseeable or intended user."  Id.  To prove a manufacturing defect, the plaintiff must show that the product "deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae."  N.J.S.A. 2A:58C-2.  To prove a design defect, a plaintiff must show that the product was "designed in a defective manner."  Id.  As part of its prima face case, the plaintiff is "required to prove that a practical and feasible alternative design existed that would have reduced or prevented his harm."  Lewis v. Am. Cyanamid Co., 155 N.J. 544, 560 (1998).  The plaintiff has submitted no evidence of a proposed alternative design.  In any event, the Court finds that the defendant is entitled to summary judgment on both claims, because Atlantic cannot prove that either a manufacturing defect or a design defect existed when the product left the manufacturer's control.

A plaintiff can establish a defect through direct or circumstantial evidence, or by "negat[ing] other causes of the failure of the product for which the defendant would not be responsible."  Scanlon v. Gen. Motors Corp., 65 N.J. 582, 591-94 (1974).  Atlantic relies primarily upon the opinions of its two experts (direct evidence) to establish a manufacturing

NOT FOR PUBLICATION

defect.  Plaintiff's expert Joel Liebesfeld concludes that "the failures of the diesel engines within generator #1 and generator #3 were caused by the defective design and operation of certain component parts contained within those engines."  (Liebesfeld Aff. at ¶ 9.)  Those component parts were, namely, "pistons, piston rods and cylinder walls manufactured by Cummins, Inc., as well as governors manufactured by Bosch."  (Id.)  He further states that these parts were "incorporated into generator #1 and generator #3 by Cummins, Inc. prior to the time of the original installation of generator #1 and generator #3 at the Hospital."  (Id.)  So, essentially, the allegedly defective parts were part of the original generators installed in 1983.  Plaintiff's expert Philip Sadtler identifies parts in generator #3 as defective, including the Bosch speed governors, and "fuel injection nozzles and an injection pump that were manufactured by Cummins, Inc." (Sadtler Aff. at ¶ 5.)  Like Mr. Liebesfeld, he states that "[a]ll of those components were installed into generator number three by Cummins, Inc. prior to the time that generator number three was originally sold to the hospital in 1983."  (Id.)

Theoretically, Cummins, Inc. could be held liable for the speed governors manufactured by Bosch.

> [A] manufacturer or distributor of a component product is liable for the harm caused by a defective finished product when: (1) such defect was caused by the integration of a defective component product into the finished product; or (2) the manufacturer or distributor of the component product substantially participates in the integration of the component product into the ultimate design of the finished product; and i) integration of the component product causes the product to be defective; and ii) the resulting defective product is a proximate cause of the harm.

Boyle v. Ford Motor Co., 399 N.J.Super. 18, 24 (App. Div. 2008) (citing Restatement (Third) of Torts: Products Liability § 5 (1998)).  Atlantic suggests as much, arguing that the Bosch speed governors were incorporated into generators #1 and #3 by Cummins pursuant to its own design

**NOT FOR PUBLICATION**

and manufacturing specifications and standards.  However, such liability presumes the existence of a product *defect*, and is subject to the same standards of proof.

When deposed, both experts admitted that they could not conclude that the generators, or their parts, were defective when originally installed.  Mr. Liebesfeld said that "the equipment, in fact, became defective.  Was it defective out of the box?  I have no idea.  It is beyond my scope of knowledge."  (Df. Ex. 6, Liebesfeld Dep.)  When Mr. Sadtler was asked whether it was his opinion that the Cummins generators were "defective at the time they were installed at the Overlook Hospital," his answer was, "I have no way of making an intelligent answer to that because I have no records prior to 1998."  (Df. Ex. 7, Sadtler Dep.)  He also stated, "I do not say that they [the generators] were defective at the time of delivery."  (Id.)  Plaintiff clearly cannot prove that a defect existed when the product left the manufacturer's control.  "Such proof has been made an explicit element of action in strict liability in tort," and "[t]his hurdle is the more difficult obstacle for plaintiff to overcome."  Scanlon, 65 N.J. at 591.  Atlantic has not done so here.

Even without these concessions, Atlantic could not prove that a defect existed while the product was in the control of the manufacturer.  The plaintiff has certainly not negated other causes of the failure; indeed, one of its alternative theories of liability is that the power generators were negligently maintained.  See Scanlon, 65 N.J. at 600 (finding that the plaintiff did not sufficiently negate possible alternative causes because "he failed to establish that the defective condition was not the result of faulty maintenance.")  Atlantic also cannot prove a defect circumstantially, "by means of 'other evidence which would permit an inference that a dangerous condition existed prior to sale.'"  Scanlon, 65 N.J. at 592-93 (quoting Jakubowski v.

15

**NOT FOR PUBLICATION**

<u>Minnesota Mining & Manufacturing</u>, 42 N.J. 177, 184 (1964)).  In assessing the permissibility of such an inference, the <u>Scanlon</u> court said that:

> Generally speaking, the older a product is, the more difficult it is to prove that a defect existed while in the control of the manufacturer.  No product is meant to last indefinitely and many products require care and maintenance to perform at the same level as they did when new.  With many products proof that the defect arose while in the hands of the manufacturer becomes very difficult, if not impossible, after a certain age.

<u>Scanlon</u>, 65 N.J. at 593.  The power generators at issue are approximately 26 years old.  As discussed, Atlantic's experts both state that the allegedly defective parts were components of the original generators installed in 1983.  To prove a defect through circumstantial evidence, the jury must be able "to infer that in the normal course of human experience an injury would not have occurred at this point in the product's life span had there not been a defect attributable to the manufacturer."  <u>Id.</u> at 593.  The Court finds that no reasonable juror could infer that an injury would not have occurred twenty-six years into the power generators' life span had there not been a product defect.  Indeed, the very fact that these parts functioned for twenty-six years belies the presence of a defect.  The Court concludes that the defendant is entitled to summary judgment on all of the plaintiff's strict product liability claims.

   *A)  Spoliation Inference*

   Atlantic argues that, as a result of Cummins' spoliation of evidence, it is entitled to an adverse inference that the generators were defective.  Plaintiff claims that this spoliation occurred immediately following the May 7, 2006 power failure, when Cummins personnel worked on the "teardown" and refurbishment of the power generators.  "Spoliation of evidence in a prospective civil action occurs when evidence pertinent to the action is destroyed, thereby interfering with the action's proper administration and disposition."  <u>Manorcare v. Health Servs.,</u>

**NOT FOR PUBLICATION**

Inc. v. Osmose Wood Preserving, Inc., 336 N.J.Super. 218, 226 (App. Div. 2001).  The duty to

preserve evidence arises when there is:

> 1) [P]ending or probable litigation involving the [plaintiffs];  2) knowledge by the
> [defendant] of the existence or likelihood of litigation;  3) foreseeability of harm
> to the [plaintiffs], or in other words, discarding the evidence would be prejudicial
> to [plaintiffs]; and 4)  evidence relevant to the litigation.

Id. at 226 (quoting Aetna Life and Cas. Co. v. Imet Mason Contractors, 309 N.J.Super. 218, 366-

67 (App. Div. 1998)).  "The spoliator's level of intent, whether negligent or intentional, does not

affect the spoliator's liability.  Rather, it is a factor to be considered when determining the

appropriate remedy for the spoliation."  Hirsch v. Gen. Motors Corp., 266 N.J.Super. 222, 256

(Law Div. 1993).  A spoliation inference is one such remedy used by the courts.   The inference

"permits the jury to infer that the evidence destroyed or concealed would not have been

favorable to the spoliator."  Jerista v. Murray, 185 N.J. 175, 202 (2005).

The plaintiff points to the testimony of several Cummins employees in support of its

argument.  When asked about the preservation of the original components removed from the

generators, Cummins Metropower service technician Richard Evelyn testified that he believed

those components were "dumped" because that is what Cummins Metropower personnel usually

do when they are "finished with a job."  (Pl. Ex. 13, Evelyn Dep.).  Frank Flagg, another

Cummins Metropower service technician, testified that he and his fellow technicians removed a

number of components from the generators and did not know what ultimately happened to those

components.  (Pl. Ex. 3, Flagg Dep.)  He further testified that he was unaware of any company

policy regarding the preservation of parts removed for replacement, but that he usually "scraps"

such parts if the owner does not request them.  (Id.)  Finally, two additional Cummins'

employees, Billy Fulop and John Reinhardt, testified that they were not aware of any company

policies or guidelines regarding the preservation of components removed during a job.  (Pl. Ex.

**NOT FOR PUBLICATION**

15, Fulop Dep.; Pl. Ex. 2, Reinhardt Dep.)  Mr. Reinhardt testified that he did not have any knowledge regarding the ultimate disposition of components removed from the Overlook generators.  (Pl. Ex. 2, Reinhardt Dep.)

 The Court finds that the plaintiff is not entitled to an adverse spoliation inference.  Given the factual situation, the factors regarding a duty to preserve evidence could just as easily work against the plaintiff as they could for it.  Cummins personnel came to repair the generators immediately after the power failure.  Cummins was not aware of any pending or probable litigation at that time, especially considering that this suit was not brought until approximately two years later.  At that time, the plaintiff was in a better position to know whether it was going to bring suit or not.  Indeed, it hired expert Joel Liebelsfeld within six days of the power failure. (Liebesfeld Aff. at ¶ 5.)  If anyone knew that litigation was potentially coming, it was the plaintiff.

 The destruction of relevant evidence is potentially prejudicial to both parties, and the case law shows that a plaintiff is just as capable of spoliating evidence as a defendant.  See Manorcare, 336 N.J.Super. at 236; Aetna, 309 N.J.Super. at 369.  In this situation, both parties had an equal opportunity to preserve the removed parts.  The evidence indicates that the defendant followed its usual procedure, which was to throw away the removed parts unless the client asked for them.  Compare Fleming v. Macy's East, Inc., 2008 WL 2951889, at *4 (App. Div. July 30, 2008) (finding that defendant did not have adequate notice that it should have preserved surveillance tapes where it was store policy to recycle them every two weeks, and plaintiff did not request the tapes or file her claim for nearly two years after the incident), with Ashwal v. Prestige Mgmt. Servs., Inc., 2007 WL 2989718, at *20 (App. Div. Oct. 16, 2007) (finding that a spoliation charge was appropriate where the defendant had a routine practice of

NOT FOR PUBLICATION

creating and maintaining annual performance evaluations for its employees and had no

explanation for why the plaintiffs' evaluations were missing).  Atlantic could have easily asked

for the parts; the remedial work was being done on its own premises.  The Court finds that a

spoliation inference is not appropriate.

IV.    **Breach of Contract Claims**

The plaintiff's second cause of action is for breach of contract.  To sustain a claim for

breach of contract, a party must show the existence of a contract, failure of the other party to

perform its contractual obligations, and damages flowing from the breach.  Murphy v. Implicito,

392 N.J.Super. 245, 265 (App. Div. 2007).  Defendant argues that Atlantic's breach of contract

claim must fail because Atlantic has not identified a contract between it and Cummins.  As

discussed, though, the Court finds that a material dispute of fact exists as to the relationship

between Cummins, Inc. and Cummins Metropower, Inc.  Viewing the facts in a light most

favorable to the plaintiff, there is a contract; namely, the maintenance contract between the

hospital and Cummins Metropower.

Plaintiff asserts that under the maintenance contracts, Cummins and Cummins

Metropower were responsible for installing, testing and servicing the back-up generator set

system.  The plaintiff points to service and repair records maintained through October 1998 to

May 7, 2006, indicating that the generators suffered numerous major malfunctions.  (Pl. Ex. 4,

Sadtler Report).  Mr. Sadtler states in his report that Cummins "failed to recognize, diagnose and

correct the inability of the system to perform when needed."  (Id.)  Mr. Liebesfeld testified that it

was his opinion that generator #1 "specifically failed because the overall maintenance of the gen-

set was less comprehensive than it needed to be."  (Pl. Ex. 16, Liebesfeld Dep.)  Atlantic

emphasizes that the whole point of the maintenance contracts was to prevent major malfunctions

NOT FOR PUBLICATION

such as the one that occurred on May 7, 2006.  Finally, the plaintiff alleges that it sustained

extensive damages as a result of the power failure.  The Court finds that there is a material

dispute of fact and the defendant is not entitled to summary judgment on the breach of contract

of claim.

V.    **Negligence Claims**

The plaintiff's first and eighth causes of action are for negligence and gross negligence,

respectively.  Negligence differs from gross negligence only in degree, not in kind.  Monaghan v.

Holy Trinity Church, 275 N.J.Super. 594, 599 (App. Div. 1994) (citing Prosser and Keeton, The

Law of Torts § 34 at 212 (5th ed. 1984)).  Both require a plaintiff to establish four elements: 1)

that the defendant owed the plaintiff a duty of care, 2) that this duty was breached, 3) that the

breach of duty proximately caused the plaintiff's injury, and 4) actual damages.  Weinberg v.

Dinger, 106 N.J. 469, 484 (1987).  While in a negligence action the scope of an alleged

tortfeasor's duty is a question of law for the court to decide, "the New Jersey courts have

demonstrated a strong reluctance to decide issues of common law negligence as a matter of law."

Cordy v. Sherwin Williams Co., 975 F.Supp. 639, 645 (D.N.J. 1997).

Much like its argument regarding the breach of contract claim, the defendant argues that

the negligence claims must fail because Cummins did not owe Atlantic a duty.  But as discussed,

there is a triable issue of fact regarding the relationship between Cummins and Cummins

Metropower.  The contractual relationship created by the maintenance contracts would establish

a duty running from defendant to the plaintiff.  The plaintiff asserts that the generators were

negligently maintained.  As example, Mr. Stadtler states in his report that some of the failures

documented in the repair histories were "serious enough to warrant an engine overhaul," and that

the age of the system mandated deeper testing than that performed by Cummins.  (Pl. Ex. 4,

**NOT FOR PUBLICATION**

Stadler Report).  He states that it took a catastrophic failure for Cummins to perform the tests and "extensive system shakedowns, overhauls and replacements that were necessary to have a truly reliable stand-by system."  (Id.)  Plaintiff argues that if Cummins and Cummins Metropower had properly fulfilled their obligations under the maintenance contract, the massive system failure and resulting damages could have been avoided.  The Court finds that triable questions of fact exist as to whether plaintiff's injuries were proximately caused by Cummins' negligent installation and/or maintenance of the power generators.  The defendant's motion for summary judgment on the negligence and gross negligence claims is denied.

**VI.    Res Ipsa Loquitor**

The plaintiff's ninth cause of action is for "negligence based upon res ipsa loquitor."  The Court notes, initially, that the res ipsa doctrine is not an independent cause of action.  See Alcalde v. Kipiani, 2008 WL 1930585, at *2 (App. Div. May 5, 2008).  The res ipsa doctrine simply "permits an inference that the plaintiff's injury was caused by the defendant's negligence."  Jabukowski v. Minnesota Mining and Mfg., 42 N.J. 177, 184 (1964).  The following conditions must be shown:

> (a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality [causing the injury] was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect.

Buckelew v. Grossbard, 87 N.J. 512, 525 (1981).  Viewing the facts in a light most favorable to plaintiff, a jury could find that the massive power failure in this case bespeaks negligence, where the defendant was obligated to maintain and repair the power generators.  See e.g. Allendorf v. Kaiserman Enter., 266 N.J.Super. 662, 668 (App. Div. 1993) (finding that res ipsa instruction was appropriate against elevator maintenance company where plaintiff's expert testified that the "elevator was generally in a poor state of repair during the period prior to plaintiff's accident.").

**NOT FOR PUBLICATION**

There is also no evidence in the record indicating that the power failure was the result of plaintiff's own voluntary act or neglect.

The parties' primary dispute centers upon the second factor, exclusive control. The defendant argues that the plaintiff cannot establish exclusive control because from 1983 to 2006, the Overlook Hospital's Facilities Engineering Department tested the generators weekly. Plaintiff counters with testimony by a member of Atlantic Health's staff, who explained that they were not responsible for the generators' upkeep; rather, Cummins was responsible for the upkeep under the maintenance contracts. The staff member said that hospital employees "monitored [the generators] in the electric shop during our regular testing to make sure that if anything came up we would call Cummins and say, 'We discovered this. Come fix it.'" (Pl. Ex. 1, Murphy Dep.) The plaintiff's evidence is sufficient to create a material dispute of fact, because the plaintiff "need not exclude all other persons who might possibly have been responsible where the defendant's negligence appears to [be] the more probable explanation of the accident." Bornstein v. Metropolitan Bottling Co., 26 N.J. 263, 273 (1958). The defendant's final argument is that the plaintiff cannot establish exclusive control because Cummins Metropower performed planned maintenance on the generators. But given the factual dispute regarding the relationship between Cummins and Cummins Metropower, Metropower's maintenance of the generators is exactly how the plaintiff *would* establish exclusive control, since Metropower has been performing maintenance on the generators since they were originally installed. The Court finds that a material dispute of fact exists as to the res ipsa loquitor factors, particularly exclusive control. Defendant is not entitled to summary judgment, and the Court will decide whether the doctrine will be applied after plaintiff presents its evidence at trial. The Court will determine the appropriateness of a res ipsa loquitor instruction at that point.

**NOT FOR PUBLICATION**

## CONCLUSION

The defendant's motion for summary judgment as to the plaintiff's third cause of action in strict products liability, fourth cause of action in breach of express and implied warranties, fifth cause of action in breach of implied warranty of merchantability, sixth cause of action in breach of implied warranty of fitness for a particular purpose, and seventh cause of action based upon breach of express warranty is GRANTED.  Defendant's motion for summary judgment as to plaintiff's first cause of action in negligence, second cause of action in breach of contract, eighth cause of action in gross negligence, and ninth cause of action for negligence based upon res ipsa loquitor is DENIED.

<u>**s/ William H. Walls**</u>
United States Senior District Judge